# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES STUBBLEFIELD<br>    LA. DOC #88977 | CIVIL ACTION NO. 6:14-cv-0997 |
| VS. | SECTION P |
| | JUDGE HAIK |
| WARDEN LOUISIANA STATE<br>PENITENTIARY | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254 on May 14, 2014 by *pro se* petitioner James Stubblefield. Petitioner is an inmate in the custody of the Louisiana Department of Corrections incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Petitioner attacks his 2011 conviction for aggravated rape entered by the Twenty-Seventh Judicial District Court for St. Landry Parish, Louisiana, for which petitioner was sentenced to life imprisonment.

This matter has been referred to the undersigned in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the court. For the following reasons, it is recommended that this *habeas corpus* petition be **DENIED AND DISMISSED WITH PREJUDICE**.

## STATEMENT OF THE CASE

In 2009, a St. Landry Parish grand jury charged petitioner with the August 18, 1994 aggravated rape of J.S., who at that time was a juvenile. The rape occurred while

the victim and her brother, also a juvenile at the time, were left alone in an Opelousas hotel room where they were living, while their mother was at work.  The perpetrator was permitted by the children to enter the hotel room after telling the children that their mother had sent him to see if they needed anything from the store. The perpetrator then took J.S. into the bathroom and raped her.

Petitioner was found guilty of the aggravated rape of J.S. on March 3, 2011, following a trial by jury.  On April 21, 2011, petitioner was sentenced to life imprisonment.

On December 7, 2011, the Louisiana Third Circuit Court of Appeal affirmed petitioner's conviction and sentence.   Petitioner raised the following grounds on direct appeal:  (1) Petitioner's rights under the Confrontation Clause were violated  when the trial court admitted State's Exhibit 8 into evidence (a drawing showing where cuttings were taken from the victim's pants presented during the testimony of George Schiro); and (2) insufficiency of the evidence. [Doc. 1-3, pg. 2-21 (Appellant's Brief on Appeal); Doc. 1-3, pg. 57-72 through 1-4, pg. 1-3,  *State of Louisiana v. James Stubblefield*, 2011-00579, 2011 WL 6077822, 81 So.3d 1013  (La. App. 3rd Cir. 2011)].  The Third Circuit did not reach the merits of petitioner's Confrontation Clause claim under La. C. Crim. P. art. 841(A) and La. C. Ev. art. 103 because counsel did not make a contemporaneous objection at trial based on the Confrontation Clause, but rather objected for failure to lay a proper foundation for introduction of the exhibit, and a new basis for an objection may

2

not be urged for the first time on appeal.  *Stubblefield*, 2011 WL 6077822 at *9-10.

On December 27, 2011, petitioner filed a writ application in the Louisiana Supreme Court; on April 20, 2012, the Louisiana Supreme Court denied writs without comment. [Doc. 1-4, pg. 5-23 and pg. 25, *State of Louisiana v. James Stubblefield*, 2012-KO-0019,  85 So.3d 1267 (La. 2012)].

On February 11, 2013, petitioner filed an application for post-conviction relief in the Twenty-Seventh Judicial District Court, which was denied by the trial court on April 26, 2013. [Doc. 1-4, pg. 27-49, and pg. 51-52].  Petitioner asserted (1)  that he was denied the effective assistance of counsel because counsel (a) failed to investigate the allegations against petitioner and (b) failed to take a writ based on Confrontation Clause grounds when the court ruled in favor of allowing the testimony of George Schiro  regarding a forensic lab report (a drawing showing where cuttings were taken from the victim's pants), and (2)  that petitioner was prejudiced by the testimony of Sergeant Kenneth Edwards, a "compromised" police officer. [*Id.*].

 On May 30, 2013, petitioner applied for writs in the Third Circuit Court of Appeals.  The Third Circuit denied writs on August 15, 2013, finding "no error in the trial court's April 26, 2013 ruling", and Judgment was mailed that same date.  [Doc. 6, pg. 1, *State of Louisiana v. James Stubblefield*, KH 13-0621 (La. App. 3rd Cir. 2013)].

Petitioner filed an original writ application in the Louisiana Supreme Court which was signed by petitioner on September 12, 2013 and post-marked by the Louisiana State

Penitentiary on September 13, 2013.  That writ application, however, did not address any of the claims made be petitioner in the lower courts during post-conviction proceedings. Rather, the writ application improperly presented the claims made by petitioner on direct appeal.

By letter dated October 1, 2013, inmate counsel wrote to the Clerk of the Louisiana Supreme Court advising the Clerk that, in his original writ application, petitioner had "inadvertently addressed the issues which were raised during the course of his direct review. . . ."  Accordingly, petitioner enclosed for filing a supplemental writ application, in which he addressed his post-conviction claims.

Because petitioner had only provided this court with a copy of his supplemental writ application [Doc. 1-5, pg. 23-43], which was not timely filed within 30 days after the August 15, 2013 mailing of the Third Circuit's Notice of Judgment, the undersigned issued a Report and Recommendation finding this federal habeas corpus petition time-barred by the one-year limitation provision set forth in 28 U.S.C. § 2244(d). [rec. doc. 7].

However, after receiving the entire record from the Louisiana Supreme Court and discovering of the original timely filed writ application which did not address petitioner's post-conviction claims, the undersigned vacated that Report and Recommendation, reserving the State's right to raise any timeliness, exhaustion and procedural default issues by response herein.

4

On April 25, 2014, the Louisiana Supreme Court denied writs without comment. *State of Louisiana ex rel. James Stubblefield v. State of Louisiana*, 2013-2224, 138 So.3d 637 (La. 2014). [Doc. 1-5, pg. 45].

Petitioner filed the instant petition on May 14, 2014.  He asserts the following claims for relief: (1) Petitioner's rights under the Confrontation Clause were violated when the trial court admitted State's Exhibit 8 into evidence (a drawing showing where cuttings were taken from the victim's pants presented during the testimony of George Schiro); (2) insufficiency of the evidence; (3) ineffective assistance of counsel because counsel (a) failed to investigate the allegations against petitioner and (b) failed to take a writ based on Confrontation Clause grounds when the court ruled in favor of allowing State Exhibit 8, a drawing showing where cuttings were taken from the victim's pants, into evidence during the testimony of DNA analysis expert George Schiro; and (4) that petitioner was prejudiced by the testimony of Sergeant Kenneth Edwards, a "compromised" police officer.   The State has filed an Answer and Memorandum in Opposition to federal habeas corpus relief [rec. doc. 23].  No Reply has been filed by petitioner.  This Report and Recommendation follows.

## LAW AND ANALYSIS

### I.  Procedural Default

The State contends that petitioner's first claim for relief, that petitioner's rights under the Confrontation Clause were violated when the trial court admitted State's Exhibit

8 into evidence, is traditionally procedurally defaulted. In light of the above procedural history, the Court agrees.  On direct appeal, the  Louisiana Third Circuit Court of Appeal did not reach the merits of petitioner's Confrontation Clause claim.  Instead, the Third Circuit expressly relied on the contemporaneous objection rules set forth in La. C. Cr. P. article 841 and La. C. Ev. art. 103 to deny merits review of this claim, because counsel did not make a contemporaneous objection at trial based on the Confrontation Clause, but rather objected for failure to lay a proper foundation for introduction of the exhibit, and a new basis for an objection may not be urged for the first time on appeal.  *Stubblefield*, 2011 WL 6077822 at *9-10. The Louisiana Supreme Court denied writs without comment.  *State of Louisiana v. Joseph Thomas Savoie*, 992 So.2d 1011 (La. 10/3/2008). Accordingly, the last reasoned decision on petitioner's claims, that of the Louisiana Third Circuit Court of Appeal, clearly and expressly relied on these state procedural rules as the basis for its Judgment.[1]

The scope of federal *habeas* review is limited by the intertwined doctrines of procedural default and exhaustion. Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal,

---

[1]The Louisiana Supreme Court did not articulate reasons for its denial of writs. However, where there has been a reasoned state court judgment which explicitly rejects the federal claim on state procedural grounds, subsequent unexplained judgments upholding the previous judgment or rejecting the claim are presumed to rely upon the same ground. In other words, when the last reasoned decision on the claim explicitly relied upon a state procedural default, federal courts must presume that later decisions rejecting the claim "did not silently disregard that bar and consider the merits."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

("traditional" procedural default), or (2) the petitioner fails to properly exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal *habeas* claim. *Bledsue v. Johnson*, 188 F.3d 250, 254–55 (5th Cir.1999) *citing Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1986) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

The "traditional" procedural default doctrine applies to bar federal *habeas corpus* review when a state court declines to address a prisoner's federal claims because the prisoner failed to follow a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Federal courts typically refuse to reach the merits of questions of federal law if the state courts have expressly relied on an "adequate and independent" state procedural ground in refusing to review the claim. "An 'adequate' rule is one that state courts strictly or regularly follow, and one that is applied evenhandedly to the vast majority of similar claims." *Glover v. Cain*, 128 F .3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998) *citing Amos v. Scott,* 61 F .3d 333, 339 (5th Cir. 1995). A state procedural rule enjoys a presumption of adequacy when the state court expressly relies on it in deciding not to review a claim for collateral relief. *Id. citing Lott v. Hargett* 80 F.3d 161, 165 (5th Cir.1996). A procedural rule is "independent" when the last state court rendering a judgment in the case "clearly and expressly" indicates that its judgment rests on the

procedural ground. *Amos,* 61 F.3d at 338.

The procedural rules identified in this case satisfy both requirements. Petitioner herein makes no showing that Louisiana Code of Criminal Procedure article 841 or Louisiana Code of Evidence article 103 are not evenhandedly applied. Thus, these state court procedural rules are presumed "adequate."  Moreover, review of published Louisiana jurisprudence establishes that the Louisiana courts of appeal regularly invoke the contemporaneous objection rule set forth in article 841 to decline review of similar claims when no contemporaneous objection is lodged.

Furthermore, both the Fifth Circuit, this Court and other Louisiana district courts within the Fifth Circuit have held that it is well-settled that the Louisiana contemporaneous objection rules are independent and adequate state procedural grounds which preclude federal *habeas corpus* review of claims.  *Duncan v. Cain*, 278 F.3d 537, 541 (5th Cir. 2002);  *Toney v. Cain,* 24 F.3d 240, 1994 WL 243453, at *2 (5th Cir. 1994); *Jones v. Warden*, 2010 WL 817311, *10 (W.D. La. 2010) (finding La. C.Cr.P. art. 841 is an adequate and independent ground to preclude review of a Confrontation Clause/ *Crawford* Claim); *Grace v. Warden Louisiana State Penitentiary*, 2015 WL 2185207, *8 (W.D. La. 2015) (finding La. C.Cr.P. art. 841 is an adequate and independent ground to preclude review of a Confrontation Clause/ *Crawford* Claim); *Landry v. Cain*, 2013 WL 1103276, *5-7 (E.D. La. 2013) (and cases cited therein) (finding  La.C.Cr.P. art. 841 and La.C.Ev. art. 103 are adequate and independent grounds  to preclude review of a Confrontation Clause/ *Crawford* Claim).

Furthermore, the rules cited by the Third Circuit are "independent" because the last reasoned judgment on petitioner's claims, that of the Third Circuit Court of Appeals on direct appeal, expressly relied solely on state procedural rules in declining to reach the merits of petitioner's claim. Since the Louisiana Supreme Court did not specify reasons for its denial of review, it must therefore be presumed that the Supreme Court, like the Third Circuit, did not reach the merits of the claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

**Cause and Prejudice/Miscarriage of Justice**

Because petitioner's Confrontation Clause claim (claim 1, herein) is traditionally procedurally defaulted, this court may refuse to review the merits of this claim unless petitioner demonstrates that he should be excused from application of the procedural default doctrine. This he can do by showing cause and prejudice for the default[2] or that a miscarriage of justice[3] will result from the denial of federal *habeas* review. *See Finley*,

---

[2] In *Murray v. Carrier*, the Supreme Court explained that "cause" requires an impediment external to the defense: "[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Murray v. Carrier*, All U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (internal citations omitted).

[3] In order for a *habeas corpus* petitioner to avoid a procedural default by showing a fundamental miscarriage of justice, the petitioner must assert his actual innocence by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 106 S.Ct. at 2649; *Glover*, 128 F.3d at 904. To support such an exception, the petitioner must allege that, as a factual matter, he did not commit the crime of which he was convicted. *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998); *Ward*, 53 F.3d at 108. Thus, the petitioner must make a "colorable showing of factual innocence." *Callins*, 89 F.3d at 213 *quoting McClesky*, 499 U.S. at 495, 114 S.Ct. at 1471.

243 F.3d 215, 220-221 (5th Cir. 2001); *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565*;*

*McCleskey v. Zant*, 499 U.S. 467, 493-495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991);

*Moore v. Roberts*, 83 F.3d 699, 704 (5th Cir. 1996); *Gray v. Netherland*, 518 U.S. 152,

116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Sones*, 61 F.3d at 418; *Murray*, 477 U.S. at 496,

106 S.Ct. at 2649; *Glover*, 128 F.3d at 904; *Ward v. Cain*, 53 F.3d 106, 107-108 (5th Cir.

1995); *Callins v. Johnson*, 89 F.3d 210, 213 (5th Cir. 1996) *quoting McClesky*, 499 U.S. at

495, 114 S.Ct. at 1471.

The cause of petitioner's default on his first claim for relief was his counsel's

failure to object on Confrontation Clause or *Crawford* grounds.  This failure was clearly

not an "impediment external to the defense." Thus, petitioner has not shown "cause" for

his default. This Court therefore need not consider whether there is actual prejudice.

*Saahir v. Collins*, 956 F.2d 115, 118 (5th Cir. 1992).

Likewise, petitioner has not shown that, as a factual matter, he is actually innocent

of the crime for which he was convicted and, thus, he will not suffer a fundamental

miscarriage of justice from this Court's failure to consider his claims. Accordingly,

petitioner cannot avoid procedural default on grounds of actual innocence.

For these reasons, petitioner's first claim for relief, that petitioner's rights under the

Confrontation Clause were violated when the trial court admitted State's Exhibit 8 into

evidence, is procedurally defaulted.  Federal *habeas corpus* relief on this claim is

therefore precluded.

Petitioner's remaining claims are addressed on the merits below.

*Standard of Review*

This *habeas* petition was filed on April 15, 2014; therefore the standard of review

is set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the Antiterrorism and Effective

Death Penalty Act (AEDPA).  *Knox v. Johnson,* 224 F.3d 470, 476 (5ᵗʰ Cir. 2000); *Orman*

*v. Cain,* 228 F.3d 616, 619 (5ᵗʰ Cir. 2000).[4]  AEDPA substantially restricts the scope of

federal review of state criminal court proceedings in the interests of federalism, comity,

and finality of judgments.  *Montoya v. Johnson*, 226 F.3d 399, 403-04 (5ᵗʰ Cir. 2000)

*citing Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and

*Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000)[5] (noting

that AEDPA "placed a new restriction on the power of federal courts to grant writs of

*habeas corpus* to state prisoners").

Title 28 U.S.C. § 2254(d) as amended, states as follows:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[4]Before enactment of AEDPA, "a federal court entertaining a state prisoner's application for *habeas* relief . . . exercise[d] its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (i.e., application of constitutional law to fact).  In other words, a federal *habeas* court owed no deference to a state court's resolution of such questions of law or mixed questions."  *Montoya ,* 226 F.3d at 403-04  *citing Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000) and 28 U.S.C. S 2254(d) (West 1994).

[5]Justice O'Connor delivered the opinion of the Court with respect to the standard of review, while Justice Stevens delivered the opinion of the Court with respect to other aspects of the opinion which have no bearing on the issues herein.  Accordingly, the undersigned will refer to Justice Steven's opinion as a concurring opinion.

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the deferential scheme of § 2254(d), as amended, this Court must give deference to a state court decision for "any claim that was adjudicated on the merits in State court proceedings" unless the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,", or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

A *habeas* petitioner has the burden under AEDPA to prove that he is entitled to relief.  *Ormon*, 228 F.3d at 619 *citing Williams,* 120 S.Ct. at 1518, and *Engle v. Isaac*, 456 U.S. 107, 134-35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).  Under § 2254(d), as amended, "[t]he federal courts no longer have a roving commission to discern and 'correct' error in state court proceedings, but must exercise a more limited review . . . ." *Grandison v. Corcoran*, 78 F.Supp.2d 499, 502 (D. Md. 2000).  Federal courts may not grant the writ merely on a finding of error by a state court or on a finding of mere disagreement with the state court.   *Montoya,* 226 F.3d at 404;  *Orman,* 228 F.3d at 619.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question

of law or if the state court decides a case differently than . . . [the Supreme Court] has on a  set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) *citing Williams,* 120 S.Ct. at 1523;  *Montoya,* 226 F.3d at 403-04 *citing Williams*, 120 S.Ct. at 1523.  "The 'contrary to' requirement 'refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Dowthitt,* 230 F.3d at 740 *citing Williams*, 120 S.Ct. at 1523.

Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt,* 230 F.3d at 741 *citing Williams,* 120 S.Ct. at 1523.  The standard is one of objective reasonableness. *Montoya,* 226 F.3d at 404 *citing Williams,* 120 S.Ct. at 1521-22.  A federal *habeas* court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . [r]ather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Section 2254(d)(2) speaks to factual determinations made by the state courts. *Dowthitt,* 230 F.3d at 741.  Federal *habeas* courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence.  *Id.*  Thus, this Court must defer to the state court's decision unless it was based on an unreasonable determination of the facts in light of the record of the State court proceeding.  *Id. citing* 28 U.S.C. § 2254(d)(2); *Knox,* 224 F.3d at 476 *citing Chambers v.*

*Johnson,* 218 F.3d 360, 363 (5th Cir. 2000).

In sum, "[a] state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 786 (2011). Thus, under § 2254(d), "[a]s a condition for obtaining *habeas corpus* from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-787.  "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 786.

## I. Sufficiency of the Evidence

Petitioner argues that there was insufficient evidence to support his aggravated rape conviction. More specifically, petitioner contends that the testimony of the victim, J.S., was insufficient to establish penetration because her trial testimony was inconsistent with her statements made to the emergency room physician, Dr. Parks, at the time of the rape, not corroborated by physical evidence (that is, negative rape kit results and no evidence of physical trauma to J.S.) thereby "presenting a "serious question as to the believability of J.S."  Petitioner additionally argues that the DNA evidence was insufficient to prove that he was the perpetrator of the crime, given the DNA evidence was from a "small cutting taken not from the crotch area of the pants, but from the

buttocks area of pants J.S, identified as belonging to her mother"[6] and the absence of any eyewitness identifications of petitioner as the perpetrator.

The claim presented to this Court is identical to that presented to the Louisiana Third Circuit Court of Appeal on direct appeal.  In rejecting this claim, the Louisiana Third Circuit Court of Appeal, extensively analyzed the evidence presented at trial, and found that the evidence was sufficient to support petitioner's conviction under the federal standard set forth by the United States Supreme Court in *Jackson v. Virginia*.   *State v. Grace*, 61 So.3d 812, 817-821 (La. App. 3rd Cir. 2011).  Based on the testimony and evidence presented at trial, the Third Circuit ultimately held as follows:

> The evidence most favorable to the prosecution shows that, in 1994, J.S. was under the age of twelve. In August of that year, a man had her remove her pants and then proceeded to put his penis inside of her vagina; the penetration caused J.S. to experience pain in her lower abdomen, hurt enough to make her scream, and triggered menstruation. Although there was no physical evidence of trauma to J.S.'s vagina or anus, the doctor who examined J.S. and performed her rape kit said that it was not unusual for this type of activity to leave no physical evidence of trauma or injury in the victim, even in cases where the victim was a young girl.
>
> When the authorities arrived, J.S. reported that she had been raped. A law enforcement officer collected the pants that J.S. was wearing at the time of his arrival on the scene. They had been present in the room at the time of the rape, and J.S. had put them on after the rape. Even though the garment technically belonged to J.S.'s mother, J.S. was the only person who wore the pants. Based upon a semen sample removed from the pants, the defendant was eventually identified as the perpetrator within a 99.9% certainty.
>
> Therefore, when the evidence is viewed in the light most favorable to the prosecution, a reasonable fact finder could have found that the defendant

---

[6]Petitioner's Sixth Amendment claim regarding the drawing showing where cuttings were taken from the victim's pants (State's Exhibit 8) under *Crawford* has been dismissed as procedurally defaulted.

used his penis to penetrate either the aperture or the external features of J.S.'s vagina when J.S. was a child under the age of twelve. Thus, there is sufficient evidence to support the defendant's aggravated rape conviction.

*Stubblefield,* 2011 WL 6077822 at *8-9.

Under the appropriate standard of review, this Court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of the State court record.  Accordingly, the Third Circuit's decision cannot be disturbed.

The standard for reviewing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979) (emphasis added); *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991) *quoting Jackson*, 443 U.S. at 319.  Thus, a federal court "may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypothesis consistent with the defendant's claim of innocence."  *Gibson*, 947 F.2d at 783.  Stated differently, an applicant is entitled to *habeas corpus* relief only if it is found that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id. citing Jackson,* 443 U.S. at 324; *West v. Johnson,* 92 F.3d 1385, 1393 (5th Cir. 1996) *citing Jackson*, 443 U.S. at 322-26.

This Court applies the *Jackson* standard "giving great weight to the state court's determination."  *Gibson*, 947 F.2d at 782, 786; *Porretto v. Stalder*, 834 F.2d 461, 467 (5th

Cir. 1987).  Both direct and circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction.  *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990) *citing Jackson*, 443 U.S. at 319, 324-25, 99 S.Ct. at 2789, 2792; *Pate v. Wainwright*, 607 F.2d 669, 670 (5th Cir. 1979) (*per curiam*). The fact that most of the evidence against a defendant was circumstantial does not change the standard of review. *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1305 (5th Cir. 1991) *citing United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989).

Contrary to petitioner's position, as correctly noted by the Louisiana Third Circuit Court of Appeal, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, as those determinations are the exclusive province of the jury.  *United States v. Young*, 107 Fed.Appx. 442, 443 (5th Cir. 2004) *citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *Garcia*, 995 F.2d at 561 *citing United States v. Greenwood*, 974 F.2d 1449, 1458 (5th Cir. 1992); *Green v. Johnson,* 160 F.3d 1029, 1047 (5th Cir. 1998); *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (noting that it is the jury's responsibility to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."). Accordingly, "whether judges doubt the credibility of a witness, even an accomplice witness cooperating with the government, is beside the point . . . ." *Greenwood*, 974 F.2d at 1458.   All credibility choices and conflicting inferences are to be resolved in favor of the verdict.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) *citing Cyprian*, 197 F.3d

at 740.  The reviewing court is not authorized to substitute its interpretation of the

evidence for that of the fact finder. *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir.

1985).

At the time of the offenses, aggravated rape was defined in La.R.S. 14:42 as

follows:

> A. Aggravated rape is a rape committed upon a person sixty-five years of
> age or older or where the anal or vaginal sexual intercourse is deemed to be
> without lawful consent of the victim because it is committed under any one
> or more of the following circumstances:
>
> *                    *                     *
>
> (4) When the victim is under the age of twelve years. . . .

Under Louisiana law, "[e]mission is not necessary and any penetration, however

slight, of the aperture of the female genitalia, even its external features, is sufficient."

*State v. Self*,  719 So.2d 100, 101 (La. App. 3rd Cir. 1998), *writ denied*, 734 So.2d 1229

(La. 1999) *citing State v. Bertrand,* 461 So.2d 1159, 1161 (La. App. 3rd Cir. 1984), *writ*

*denied*, 464 So.2d 314 (La.1985).  Moreover, it is well established that the testimony of

the victim alone is sufficient to establish penetration.  *See State v. Rives*, 407 So.2d 1195,

1197 (La. 1091); *State v. Wright*, 690 So.2d 850, 856 (La. App. 3rd Cir. 1997); *State v.*

*Abbott*, 697 So.2d 636, 639 (La. App. 2nd Cir. 1997); *State v. Hubbard*, 708 So.2d 1099,

1104 (La.App. 5th Cir. 1998), *writ denied*,  723 So.2d 415 (La.1998).

18

Furthermore,  the testimony of the victim alone can be sufficient to establish the elements of a sexual offense even when unsubstantiated by physical evidence.  *State v. Alberto*, 665 So.2d 614, 622 (La. App. 5th Cir. 1995), *writ denied,* 670 So.2d 1237 (La. 1996); *State v. Ingram*, 688 So.2d 657, (La. App. 2nd Cir. 1997) ("The testimony of the victim alone is sufficient to prove the elements of the offense even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant."); *State v. Hotoph*,  750 So.2d 1036, 1045 (La. App. 5th Cir. 1999), *writs denied*, 765 So.2d 1062, 765 So.2d 1066 (La. 2000) ("The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense."); *State v. Hubbard*, 708 So.2d at 1104 ("[T]he testimony of the victim alone, unsubstantiated by physical evidence, is sufficient to support a conviction of rape.").

The evidence was summarized by the Third Circuit as follows:

J.S. was born on August 30, 1983. On August 18, 1994, she, her older brother J.D.S., and her mother were all staying in a hotel in Opelousas. J.D.S. was eighteen months older than J.S. J.S.'s mother was at work when the incident occurred. The incident occurred around 8:30 or 9:00 p.m. when J.S. and J.D.S. were alone in the room. Someone knocked on the door, so J.S. and J.D.S. went to the door. J.S. testified that when she looked through the peep hole, she saw a tall male with a medium build; he seemed really tall to her at the time. J.D.S. asked who was at the door, and the man replied that their mother had sent him to ask if they needed anything from the store. J.S. and J.D.S. were not allowed to leave the room when their mother was gone.

J.S. said that she and J.D.S. made the mutual decision to open the door so they could speak with the man, so J.D.S. opened the door a crack. They did not have a chain on the door. The man repeated that their mother had sent him to see if they needed anything from the store and to get whatever they needed for them. J.S. said they told the man that they were okay and did not need anything. At that point, the man entered the room without being invited and shut the door behind him.

J.S. recalled that, once the man was in the room, he asked them if they had any money. J.S. and J.D.S. looked at each other, but they did not reply. They began to suspect something was wrong because the man, who had just offered to get them something from the store, was now asking them for money. J.S. did not see a weapon, and, at first, the man just stood there and looked around. When J.S. and J.D.S. restated that they were okay, the man looked at J.S. and told her he wanted to talk to her in the bathroom. J.S. asked her brother why the man wanted to talk to her in the bathroom. At that point, the man instructed J.D.S. to sit on the bed and to not move. He also demanded J.S. accompany him to the bathroom. J.S. said she was frightened, but she went with the man into the bathroom.

J.S. related that once they were in the bathroom the man closed the door, told her to take off her pants, and instructed her to get on the floor. J.S. did not remember what type of pants she was wearing at the time. J.S. said that after she took her pants down, the man removed them from her ankles. She had nothing else on. The man then took off his pants, knelt down, and put his penis inside of her. When she screamed for her brother, the man threatened to kill J.D.S. if she did not "shut up." J.S. stopped making noise. At one point J.S. again screamed for her brother. This time, the man put his hands on her mouth and once more threatened to kill her brother if J.S. screamed again. J.S. stopped screaming. When the man was done, he stood up and put his pants back on. He then told her not to leave the bathroom or put on her clothes until he was gone or he would harm J.D.S. The man repeatedly threatened to kill J.S.'s brother. J.S. still had not seen a weapon, but she said she believed him.

J.S. reported that, once the man left the bathroom, she did not obey him. She went ahead and put her underwear back on. J.S. did not really remember what she was wearing. She ran out of the bathroom and became even more scared because her brother was gone; J.S. thought the man had taken her brother. J.S. then ran out of the hotel room and saw her brother running around the corner with the hotel manager. J.S. did not remember much that occurred after that except being taken to the hospital. J.S. did not

remember any writing on her thigh. J.S. explained that, by the time of the incident, she had already started her menses. However, she was not menstruating at the time of the incident. As a result of the trauma, her menses started after the incident.

On cross-examination, J.S. said she was not sure if she had put on the same clothes after the incident that she had been wearing beforehand. J.S. also explained she recalled that the rape kit examination at the hospital had been painful. J.S. elaborated that the man had penetrated her vaginally and that the penetration hurt enough to make her scream. J.S. reiterated that she did not remember having writing on her thigh. J.S. also did not remember the emergency room physician who treated her. J.S. said that, after the examination, she was released from the hospital, and her mother brought J.S. to her employer's home.

Dr. Kenneth Scott Parks, an expert in emergency room medicine, was the next witness to testify for the prosecution. Dr. Parks explained that State's Exhibit 1 consisted of the medical records from J.S.'s emergency room visit on August 18, 1994. Dr. Parks was the doctor who examined J.S. on that visit. He did not, however, remember the case specifically. Dr. Parks read the notation that he wrote at the time of the examination:

Ten year old, sexual assault earlier tonight. Describes tall, black male, whom she was familiar with as he works at motel. Patient let assailant inside. He told her to go into bathroom. Then to remove pants. Patient states she screamed after which male put his hand to her mouth and told her he would kill her if she didn't stop. Male forced patient to ground and moved on top of her. Patient states he place sexual organ inside her. Patient describes pain in lower abdomen with this. Afterwards he asked for money. Patient stated she had none. Male left. Patient denies being hit, pushed, thrown, etc. Has no complaints of pain prior to examine other than feeling hungry. Vitals noted.

Dr. Parks' notes then refer to separate notes regarding the rape kit. Dr. Parks said he found no trauma during his exam; however, he was not surprised because rape does not necessarily cause trauma. This was true even in a case where the victim was a young girl. Dr. Parks prepared the rape kit in the instant case. On cross-examination, Dr. Parks stated that he had found writing on J.S .'s right inner thigh. It read, "F__K YOU."

Sergeant Kenneth Edwards, with the Opelousas Police Department, was the State's third witness. Around midnight on August 18, 1994, Sergeant Edwards was dispatched to the Ranch Motel in Opelousas because there had been report of a rape. At the time Sergeant Edwards was a patrolman first class. Sergeant Edwards relayed what J .S. told him:

Well, she basically said that uh, she heard a knock on the door. She opened the door. A black male approximately 6 foot, hardly any hair in his face, he was dark complected [sic], a baseball cap, and black t-shirt with some writing on it knock[ed] on the door. She basically opened the door and at that time he came in and her brother was there also[J.D.S.] The black male told the brother to uh, continue to lay down and keep his head down and he at that time told her to uh, pretend that she wanted to go to the bathroom. Which at that time she stated that she went in the bathroom and uh, the black male subject went in the bathroom right behind her and also at that time, after entering the bathroom, he asked her for money. She told him that she ain't had no money, which at that time, he told her to pull her pants down. She screamed no and uh, at that time she also yelled for her brother. And once done that, she noticed he took his pants down and uh, pretty much stated that he raped her.

Sergeant Edwards explained that, as part of his investigation, he asked J.S. to give him the clothing she was wearing at the time of the incident. As a result, J.S. provided Sergeant Edwards with a pair of pants from the room where the attack occurred. Sergeant Edwards recalled that J.S. was very emotional at the time; she was "crying, nervous, scared." Sergeant Edwards told her that she would be all right and not to worry. J.S. was worried that the man was still around and would try to kill her, so Sergeant Edwards reassured her that the man was no longer around and that Sergeant Edwards was there instead, so there was nothing to worry about.

On cross-examination, Sergeant Edwards stated that he personally collected the pants introduced at State's Exhibit 3 from J.S. in the bathroom. Sergeant Edwards said J.S. was wearing the clothes he collected when he first arrived on the scene.

Captain Craig Thomas, with the Opelousas Police Department, was the State's fifth witness. Captain Thomas had known the defendant throughout his sixteen-year career as a police officer. As part of his duties, Captain Thomas obtained a DNA sample from the defendant on May 6, 2001.

Carolyn Booker, with the Acadiana Crime Lab, was the sixth witness for
the prosecution. The court accepted Ms. Booker as an expert in forensic
science with a specialty in DNA analysis. As part of her duties, Ms. Booker
examined the DNA sample Captain Thomas obtained from the defendant on
May 6, 2001. Ms. Booker analyzed the DNA sample and generated a DNA
profile for the defendant.

Ms. Booker's job title was CODIS Administrator. CODIS means Combined
DNA Index System. CODIS is a database of DNA profiles and can be
referenced at lab (local) level, at state level, or at a national level. The DNA
profiles from unsolved cases can be entered into CODIS at any level to
check for matches. If a match is made, then investigators have possibly
solved their case. As CODIS Administrator, Ms. Booker's was responsible
for verifying that the DNA samples entered into CODIS met with state and
federal guidelines. Ms. Booker was also the person who uploaded the DNA
profiles from the lab and sent them to the state to be searched.

Ms. Booker reported that her work was subject to peer review and approval.
George Schiro checked her work on the defendant's DNA profile and
approved her work. When Mr. Schiro's peer review was completed on June
14, 2002, Ms. Booker entered the defendant's DNA profile into CODIS.
The defendant's DNA was collected as a result of the search for the South
Louisiana Serial Killer, who turned out to be Derrick Todd Lee. Samples
from over five hundred known subjects were collected and compared to the
serial killer cases. In an effort to link the serial murders to earlier similar
cases where the victim survived for the purpose of obtaining possible
witnesses against the serial killer, the legislature provided extra funding to
create DNA profiles for old unsolved cases. This resulted in DNA profiles
being created in all unsolved sexual assault cases. The additional case load
required the crime lab to outsource the profiling of some of those cases to
three different private labs. The private labs were approved by the Acadiana
Crime Lab on the basis that they followed all federal guidelines for DNA
testing.

Ms. Booker stated that the pink pants collected by Sergeant Edwards were
examined for potential DNA evidence. Those swatches of fabric yielding
such possible evidence were removed from the garment. This process, in
accordance with general procedures, was performed in 1994 before Ms.
Booker began her employment with the Acadiana Crime Lab. Ms. Booker
sent cuttings from the pink pants for DNA profiling as part of the search for

23

cases related to the serial murders.

Ms. Booker explained that there were no names in the CODIS database. If a match returned pursuant to a search for a specific DNA profile, she usually had to fill out a form and submit a request for the name of the person who contributed the matching DNA profile to the State Police Crime Lab. The State Police Crime Lab then had to verify the match and rework the matching profile in CODIS to make sure that it had not been switched. The State Police Crime Lab would inform Ms. Booker to whom the sample in CODIS belonged only after ensuring that the person's DNA profile matched the one contained in CODIS. Once the Acadiana Crime Lab obtained the name of the potential match, it would then notify the relevant law enforcement agency with the information. The law enforcement agency would then usually be required to obtain a second DNA sample from the suspect so that another DNA profile could be generated and compared to the DNA profiles obtained from both the evidence collected and the CODIS system. However, in the instant case, no second DNA sample was required because they had performed the DNA analysis for the defendant's DNA sample at the Acadiana Crime Lab.

Dr. Nasir Butt was the State's seventh witness. At the time of trial, Dr. Butt was the supervisor for the DNA Department at the Cuyahoga County Governor's Office in Cleveland, Ohio. From 2001 until 2004, Dr. Butt was employed at DNA Reference Lab in San Antonio, Texas, as a DNA analyst and forensic scientist. The court accepted Dr. Butt as an expert in forensic science with a specialty in DNA identification. As part of his work in San Antonio, Dr. Butt separately examined a cutting taken in J.S.'s case and a blood sample provided by J.S. He then generated individual DNA profiles from each. One of the samples submitted by the Acadiana Crime Lab was stained with semen, so, using the DNA profile of the victim, Dr. Butt was able to extract the DNA profile of the semen contributor. On cross-examination, Dr. Butt explained that the cutting examined by his lab was taken from J.S.'s pants.

The prosecution's ninth witness was George Schiro. Mr. Schiro was the DNA technical leader and biology section supervisor for the Acadiana Crime Lab. The court accepted Mr. Schiro as an expert forensic scientist with a specialty in DNA analysis. Mr. Schiro conducted the peer review of Ms. Booker's analysis of the defendant's DNA. He determined that Ms. Booker had generated a scientifically reliable DNA profile.

Mr. Schiro participated in establishing the protocol and criteria for outsourcing the evidence from the Acadiana Crime Lab for DNA profiling. Mr. Schiro agreed with Ms. Booker's description of the process. Mr. Schiro did not personally review the protocols followed by DNA Reference Lab in San Antonio, but Ray Wikinheiser, the director of DNA Reference Lab, did so. Mr. Wikinheiser reviewed all of DNA Reference Lab's documentation as part of the accreditation process. Mr. Schiro personally reviewed the documents contained in State's Exhibit No. 7 and performed an independent analysis of the documents in order to form an opinion concerning the validity of the conclusions contained therein.

Mr. Schiro said that State's Exhibit No. 8 was a general worksheet used for notes when evidence is screened. Mr. Schiro noted that the sheet was initialed by Dean Lonceaux, who was retired from the Acadiana Crime Lab but working for the lab as a contract employee. Ms. Lonceaux was a lab technician. She was the person who examined bulk evidence and screened it to see if there was anything on those items requiring further analysis. Ms. Lonceaux recorded what was done, including any cuttings made, and she was also the person who cut the fabric. The worksheet referred to State's Exhibit No. 3 (the pink pants), cuttings taken therefrom, and identified the locations on State's Exhibit No. 3 from which the cuttings were taken. Using the worksheet, Mr. Schiro correlated the cuttings contained in State's Exhibit No. 5–A to the cutting locations listed in State's Exhibit No. 8.

Mr. Schiro explained that he reviewed both Ms. Booker's work on the Defendant's saliva sample and Dr. Butt's work on the cutting prior to them being matched in CODIS. After reviewing the work and the match, Mr. Schiro concluded that the defendant was the person who contributed the sperm found on the cutting:

When we did the CODIS match, we obtained a match between the reference sample of James Stubblefield and the major contributor of the sperm fraction from the pants that was generated by DNA Reference labs and to a reasonable degree of scientific certainty [99.9%] bar[r]ing identical twins, James Stubblefield is the source of that DNA profile that was found on the pants.

The odds of selecting someone else with the same DNA profile was one in 530,000,000,000,000 (five hundred thirty trillion), and there are roughly only 6,000,000,000 (six billion) people on Earth.

On cross-examination, Mr. Schiro reported that no spermatozoa was found on the samples taken for the rape kit. Sperm was only present on the pants. There were nine total cuttings taken from the pants. The only one of the cuttings that yielded semen was "from the left rump of the pink pants." On re-direct examination, Mr. Schiro clarified that each of the cuttings were taken because they indicated that the specific area of the pants had semen, blood, or both.

Dr. Nasir Butt was recalled to the witness stand after Mr. Schiro testified. Dr. Butt explained that he only tested one of the cuttings from the pants. He tested that particular sample because it appeared to have seminal material. As per protocol, once he located one sample and confirmed the presence of seminal material, he did not test the remaining cuttings as additional testing would serve no purpose.

The prosecution also recalled Ms. Booker to testify. When CODIS returned a match in the instant case, she examined and compared the two DNA profiles to verify that they matched. It was her expert opinion that the defendant's known DNA profile matched the DNA profile recovered from the pink pants.

J.D.S., J.S.'s brother, was the state's next witness. J.D.S. remembered that he and J.S. were living in a hotel on August 18, 1994. They had been there approximately six months. They lived there with their mother. Sometime that evening or early in the morning, an unknown man knocked on the door. The man's face looked familiar, possibly because he had been around or near the children before. The man mentioned their mother by her full name and informed them that she had given him money for their dinner that evening. The man had never before been in their room.

J.D.S. explained that no one besides his mother, his sister, and himself had been in the room while they lived there. They did not even have maid service because they cleaned the room themselves. It was the result of an arrangement between J.D.S.'s mother and the management. The door was locked when the man knocked. J.S. opened the door, and the man entered the room. The man waited a minute before beginning to hand over money and requesting J.D.S. go to sleep. The man told J.S. to go use the bathroom and then go to sleep.

J.D.S. recalled that he laid down and J.S. went into the bathroom. The man followed J.S. into the bathroom and closed the door. J.D.S. subsequently heard banging and his sister screaming. J.D.S. tried to open the door, but he was unable to enter, so he ran to the front and called the police. J.D.S. immediately returned to the room, but the man was gone. J.D.S. was able to generally describe the man and recalled that the man had a nice smile and made himself seem trustworthy. However, J.D.S. was unable to identify the offender in the courtroom at the time of trial.

On cross-examination, J.D.S. denied writing the phrase on J.S.'s inner thigh. J.D.S. stated that he would never do such a thing. On redirect examination, J.D.S. thought it was unlikely that J.S. ever said he had written the phrase on her. J.D.S. did not know anything about the writing until the day of trial. J.D.S. did not know who wrote the phrase.

The prosecution recalled J.S. to testify after her brother. J.S. identified the pink pants as her mother's pants. She could not recall if she had been wearing them. She often wore her mother's pants to bed. She agreed J.D.S.'s testimony was accurate. No one, including housekeeping and the perpetrator, had previously entered the room while she, her brother, and mother lived there.

On cross-examination, J.S. explained that, though her mother owned the pink pants, she never wore them, so J.S. "took them over." J.S.'s mother worked in a bar and did not usually wear hot pink pants to work. J.S. "inherited" the pants from her mother. J.S. confirmed that her brother had not written the message found near her vagina. J.S. had been unaware of the writing, so she would not have been unable to tell hospital personnel who wrote it. J.S. said that the entire incident, from the time the man entered the hotel room, lasted approximately fifteen minutes. J.S. stated that she had informed the medical personnel that the man acted as if he knew her mother, so she had supposed that the man might have been someone who was from around the motel or who worked at the attached restaurant. J.S. never said that she knew who the man was. Otherwise, the man would have already been in jail.

*Stubblefield,* 2011 WL 6077822 at *1-8 (internal footnotes omitted).

In light of the above, viewing the evidence in the light most favorable to the prosecution as is required by *Jackson* and its progeny, the evidence presented at trial was sufficient to sustain petitioner's aggravated rape conviction on federal *habeas* review. Considering  the "great weight" afforded  to the state court's determination and the above summarized evidence, the undersigned finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Although there were inconsistencies between statements made by J.S. after the rape when she was only nine years old and J.S.'s trial testimony concerning penetration, the jury presumably found that those alleged inconsistencies were entitled to little, if any, weight.  When J.S. gave a history to the nurse, she indicated that she was nor sure if there had been any "penetration." [rec. pg. 87].  It is understandable that J.S. would not understand the meaning of the word "penetration", given her young age and the traumatic sexual assault that she had just endured.  However, she told Dr. Parks, the emergency room physician who examined J.S. that night, that the perpetrator "placed [his] sexual organ inside her" and that this caused her pain in the lower abdomen. [rec. pg. 78-79]. Her substantive testimony was corroborated by Dr. Parks, who testified that his records indicated that J.S. had stated this and that he would not have written that the male put his organ inside the victim unless the victim had actually told him that. [rec. pg. 88]. It is entirely reasonable that a young victim, while not understanding the term "penetration", be able to explain what happened in simple terms stating that a sexual organ was inside of

her as J.S. did here.  Moreover, at trial, J.S., then aged twenty-seven years old and obviously familiar with the meaning and legal significance of the word "penetration", testified adamantly that the perpetrator penetrated her vaginally, hard enough to make her scream.[7] [rec. pg. 74].

Moreover, as he did in the Third Circuit on direct appeal, petitioner urges this Court to make credibility determinations, and more specifically, to find J.S.'s  testimony not credible based on the negative rape kit and lack of physical trauma to J.S., and accordingly, to weigh the evidence in his favor.  However, as recognized by the Third Circuit, on a sufficiency of the evidence review, it is not the province of a reviewing court to make credibility determinations or to review the weight of the evidence accepted by the jury. *See Young, Garcia, Greenwood, Green* and *Jackson*, *supra*.

As found by the Third Circuit, although the jury could have rejected J.S.'s testimony, and although the jury could have made contrary inferences from the evidence presented, the jury chose instead to credit the testimony of J.S.   Her  testimony establishes that the perpetrator penetrated her without her consent when she was under the age of twelve.  This testimony is sufficient to establish that an aggravated rape occurred, even in the absence of any physical evidence.  *See e.g.. State v. Rives*, 407 So.2d at 1197; *State v. Wright*, 690 So.2d at 856; *State v. Abbott*, 697 So.2d at 639; *State v. Hubbard*, 708 So.2d at 1104; *State v. Alberto*, 665 So.2d at 622; *State v. Ingram*, 688 So.2d at 664;

---

[7]J.S.'s testimony in this regard is corroborated by that of her brother, J.D.S., who testified that he heard his sister scream while she was in the bathroom with the perpetrator. [rec. pg. 160].

*State v. Hotoph*,  750 So.2d at 1045.

Furthermore, as noted by the Third Circuit, Dr. Parks explained the lack of physical trauma to J.S. testifying that rape does not necessarily cause trauma, even in cases involving young female victims, and that it has been his experience that in most of the examinations he has performed there is no evidence of trauma. [rec. pg. 79, 82-83].

Finally, a negative rape kit does not negate the fact of penetration, given that "penetration" does not require  vaginal ejaculation, but rather only entry, however slight, into the aperture of the female genitalia or its external features.  *See State v. Self*,  719 So.2d at 101 *citing State v. Bertrand,* 461 So.2d at 1161; *see also State v. Anderson*, 440 So.2d 205, 221 (3rd Cir. 1983) (upholding an aggravated rape conviction because "[a]lthough the rape kit . . . failed to indicate the presence of sperm" the victim testified that sexual penetration occurred.); *State v. Shank*, 924 So.2d 316, 322 (La. App. 5th Cir. 2006) (upholding aggravated rape conviction despite negative rape kit and absence of seminal fluid on victim's nightgown); *State v. Turner*, 904 So.2d 816, 820-823 (La. App. 5th Cir. 2005) (upholding aggravated rape conviction where no seminal fluid was found in victim's rape kit, clothing or bedding,  rejecting defendant's sufficiency of the evidence claim based on allegations that the only evidence of rape was the victim's "unbelievable testimony"); *State v. Hubbard, supra*. (the victim's testimony alone was sufficient to uphold defendant's conviction for aggravated rape despite negative rape kit).   This Court cannot find the testimony of J.S. which was obviously accepted by the jury so incredible

or insubstantial that, as a matter of law, it can be discounted.[8]

Petitioner additionally argues that the DNA evidence was insufficient to prove that he was the perpetrator of the aggravated rape of J.S.  Petitioner focuses on J.S.'s testimony that the pants on which petitioner's semen was found belonged to her mother. [rec. pg. 168].  However, as explained by the Third Circuit, while the pants technically belonged to J.S.'s mother, J.S. testified that she was the only person who wore them – thus, the pants had been "inherited" and taken over by J.S. [rec. doc. 170].  Furthermore, Sergeant Kenneth Edwards testified that he collected the pants and identified them as the pants which J.S. was wearing when he arrived at the scene. [rec. pg. 94-95]. Finally, forensic DNA expert George Schiro opined that to a 99.9 % of scientific certainty, barring identical twins, petitioner was the source of semen found on J.S.'s pants which had been collected by Sergeant Edwards.  [rec. pg. 140].

Again, although the jury could have rejected this testimony, and although the jury could have made contrary inferences from the evidence presented, the jury chose instead to credit the testimony of these witnesses.  A reviewing court is not authorized to substitute its interpretation of the evidence for that of the fact finder.  *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).   Thus, the Third Circuit correctly found that

_____

[8]To the extent that petitioner cites inconsistencies in the testimony regarding writing found by Dr. Parks on J.S.'s inner thigh, both J.D.S. and J.S. testified that J.D.S. did not write the message. [rec. pg. 170-171; 164-166].  To the extent that Dr. Parks' notes indicated the opposite [rec. pg. 83], it is not the province of this Court to make credibility determinations or to review the weight of the evidence accepted by the jury. *See Young, Garcia, Greenwood, Green* and *Jackson*, *supra*

this testimony and evidence is more than sufficient for a reasonable juror to find that petitioner committed the aggravated rape of J.S.

Finally, to the extent that petitioner argues that the evidence was insufficient because neither J.S. nor her brother J.D.S. could definitively identify petitioner as the aggravated rapist sixteen years after the crime was committed, that argument is without merit.  It is well settled that either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction; indeed, the evidence may be found sufficient even though entirely circumstantial. *See Williams v. Scott*, 39 F.3d 320 (1994) *citing Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990).  Thus, even without a positive identification of petitioner by J.S. or her brother J.D.S., the direct and circumstantial evidence set forth above and  as summarized by the Third Circuit, is more than sufficient to satisfy the *Jackson* standard.

For these reasons, petitioner's sufficiency of the evidence claim does not warrant federal *habeas* relief.

## II.  Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984).

The burden is on the petitioner to show that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 688.  Judicial scrutiny of counsel's performance must be "highly deferential," and the court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's alleged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (citation omitted).  Thus, this court's review "strongly presum[es] that counsel has exercised reasonable professional judgment."  *United States v. Payne*, 99 F.3d 1273, 1282 (5th Cir. 1996) *quoting  Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th  Cir. 1986).  Courts may "not find ineffective assistance of counsel merely because [the court] disagree[s] with counsel's trial strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) *citing Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).  Rather, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *Martinez v. Dretke,* 404 F.3d 878, 885 (5th Cir. 2005); *United States v. Cavitt*, 550 F.3d 430, 440 (5th Cir. 2008*) quoting Crane*, 178 F.3d at 314.

*Strickland's* prejudice element requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[9] A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) *citing Strickland,* 104 S.Ct. at 2068.

A petitioner must affirmatively prove prejudice.  *Deville*, 21 F.3d at 659; *Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995); *Earhart v. Johnson*, 132 F.3d 1062,1066 (5th Cir. 1998).  Self serving conclusory statements that the outcome would have been different "fall far short of satisfying *Strickland's* prejudice element."  *Sayre*, 238 F.3d at 635.  Moreover, allegations of a mere possibility of a different outcome are insufficient to establish prejudice. *Lamb v. Johnson*, 179 F.3d 352, 359 (5th Cir. 1999).

Because both *Strickland* factors, that of deficient performance and prejudice, must be satisfied, "an ineffective assistance contention may be rejected on an insufficient

---

[9]The *Strickland* court outlined the extent of prejudice that must be established by the defendant:
An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of the criminal proceeding if the error had no effect on the judgment. *Cf. United States .v Morrison,* 449 U.S. 361, 364-65 (1981).

Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability exists if the probability is sufficient to undermine confidence in the outcome.

When a defendant challenges a conviction , the question is whether there is reasonable probability that absent the errors the fact-finder would have a reasonable doubt respecting guilt.

*Strickland, supra,* at pages 691-692.

showing of prejudice, without inquiry into the adequacy of counsel's performance."
*Strickland,* 466 U.S. at 689-94.  Petitioner must satisfy both prongs of *Strickland,*
demonstrating both that counsel's  performance was deficient and that the deficiency
prejudiced the defense.  *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999); *Green v.
Johnson,* 160 F.3d 1029, 1035-36 (5th Cir. 1998). However, "[m]ere conclusory
allegations in support of a claim of ineffective assistance of counsel are insufficient to
raise a constitutional issue.*" Green,* 160 F.3d at 1043.

**(a) Failure to Investigate**

Petitioner contends that he received ineffective assistance of counsel because
counsel failed to investigate the allegations against petitioner.  More specifically, he
contends that counsel chose to defend his case on lack of physical evidence.  However, he
asserts that counsel should have investigated the fact that he never worked at the motel
where the rape occurred as the victim initially allegedly stated, which pants the victim
was wearing at the time of the attack, the fact that the victim had a habit of wearing her
mother's clothes, the fact that the victim did not understand "penetration" but understood
"rape", and that the victim's mother worked at a bar and couldn't provide a stable
residence for her family and, accordingly, the family lived temporarily from place to
place, in order to prepare an unarticulated defense, other than that chosen by counsel.

Under *Strickland*, counsel need only provide reasonable professional assistance.
*Cullen v. Pinholster*, - - U.S. - - , 131 S.Ct. 1388, 1406–07, 179 L.Ed.2d 557 (2011)
(discussing *Strickland* and post-*Strickland* cases). "A defendant who alleges a failure to

investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Druery v. Thaler,* 647 F.3d 535, 541 (5ᵗʰ Cir. 2011) *citing Nelson v. Hargett*, 989 F.2d 847, 850 (5ᵗʰ Cir. 1993) *quoting United States v. Green*, 882 F.2d 999, 1003 (5ᵗʰ Cir. 1989).

The record in this case is clear that counsel investigated and challenged all of the relevant complained of factual issues and  alleged inconsistencies in the statements of J.S. in this case by cross-examination of J.S., J.D.S. Dr. Parks, the investigating officer and expert witnesses at trial.  More specifically, defense counsel fully explored all issues regarding the pants J.S. was wearing on the night of the rape on cross-examination of J.S., the responding police officer, Sergeant Edwards. [rec. pg. 72-73, 170; 94-95].  Moreover, on cross-examination of J.S., her brother J.D.S. and Sergeant Edwards defense counsel highlighted the inconsistencies in  J.S.'s statement to Dr. Parks, including J.S.'s and J.D.S's belief that the perpetrator may have worked at the motel where the rape occurred, suggesting that someone other than petitioner was the perpetrator [rec. pg. 71, 172, 81, 158, 162], and her lack of understanding of the term "penetration" but understood the term "rape" during cross-examination of Dr. Parks. [rec. pg. 84, 87].  Indeed, from the record before this Court, it appears that counsel made virtually every challenge to the evidence which was available to petitioner.  Counsel then skillfully summarized all of this evidence for the jury during closing, arguing that the State had not met its burden of proof to demonstrate that there had been any penetration, thereby failing to prove that any rape

occurred. [rec. pg. 180-188].

While petitioner claims that counsel should have investigated J.S.'s mother regarding her economic status, her nomadic nature and undesirable working conditions, it is clear that these issues were not relevant to the issues before the Court as they could not have shed any light on the facts surrounding the crime which was committed against J.S. To the contrary, such evidence would likely have been held inadmissible.  Thus, counsel was under no obligation to conduct any investigation into these issues.   Nevertheless, testimony that the family had been living in a motel for some length of time and that J.S.'s mother worked in a bar was presented. [rec. pg. 63, 65, 70, 157-159].  For these reasons, counsel's actions were entirely reasonable under the circumstances.  Petitioner's claim of ineffective assistance of counsel therefore fails the first *Strickland* prong.

Moreover, petitioner has not shown what further investigation would have revealed, nor has he shown how further investigation or additional challenges would have helped him.  He merely speculates that he would have benefitted from more extensive investigation and additional challenges to the evidence.  Such speculation, however, does not satisfy petitioner''s burden.  *See Sayre, Supra.*  He therefore has not satisfied the second *Strickland* prong.

To the extent that petitioner argues that counsel should have presented some other unnamed defense to the charges against him, that claim is likewise without merit.   It is well settled that "[t]he law does not require counsel to raise every available nonfrivolous

37

defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127, 129 S.Ct. 1411, 1422 (2009).

Rather, decisions regarding the formulation of an appropriate defense are strategic.

Furthermore, "[w]hen counsel focuses on some issues to the exclusion of others, there is a

strong presumption that he did so for tactical reasons rather than through sheer neglect."

*Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 5 (2003) *citing Strickland*, 466 U.S. at

690.

　　Based on the record in this case, petitioner has failed to rebut the presumption of

adequate assistance.  Counsel's defense at trial was largely an argument that the

prosecution had not proved its case because there was insufficient evidence of

penetration.  This is a viable strategy, as it "sometimes is better to try to cast pervasive

suspicion of doubt than to strive to prove a certainty that exonerates." *United States v.*

*Bernard,* 762 F.3d 467, 478 (5th Cir. 2014) *quoting Richter*, 562 U.S. at ——, 131 S.Ct. at

789–90.

　　Counsel plainly put to the jury the centerpiece of his defense: that the evidence did

not satisfy the State's burden of proof because J.S.'s statements about penetration were

inconsistent and unsubstantiated by physical evidence and, more specifically, J.S.'s

statements at the emergency room regarding penetration were inconsistent, there was no

evidence of physical trauma to corroborate J.S.'s account of the rape, the rape kit was

negative for semen and J.S. was not wearing the pants upon which semen was found at

the time of the rape, rather, they were on the floor and the sperm extracted from the pants

came not from the crotch area, but rather the left buttocks.  The issues counsel omitted, if any, were not so clearly more persuasive than those he brought to the jury's attention for this Court to find that their omission constituted a professional error of constitutional magnitude.

In addition, petitioner has not demonstrated that he suffered prejudice from his counsel's performance. To prevail on his ineffective-assistance claim, petitioner must show that there is a "reasonable probability" that he would have prevailed on some other defense had counsel pursued it. However, despite his conlcusory contentions, petitioner does not propose an alternate, more persuasive defense, which upon presentation, would have caused the jury to reach a different result.  Petitioner's conclusory, self-serving allegations to on this point are insufficient.  *Sayre, supra*.

For these reasons, petitioner is not entitled to relief with respect to this claim.

**(b) Failure to Take a Writ**

Petitioner next contends that counsel was ineffective because he failed to take a writ, based on Confrontation Clause grounds, when the court ruled in favor of allowing State Exhibit 8, a drawing showing where cuttings were taken from the victim's pants, into evidence during the testimony of DNA analysis expert George Schiro.  This claim is likewise without merit. As held by the Third Circuit on direct appeal, petitioner's counsel made no objection in the trial court based on these grounds.   As such, any writ based on Confrontation Clause grounds would, like his claim on direct appeal, not have been

39

considered.  Failure to file a futile motion does not cause counsel's performance to fall below an objective level of reasonableness.  *See United States v. Preston*, 209 F.3d 783, 785 (5th Cir. 2000) *citing Green*, 160 F.3d at 1037; *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) *citing Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir. 1990).

Furthermore, counsel cannot be deemed deficient for failing to lodge an objection based on Confrontation Clause grounds.  No such objection, or subsequent writ based on such an objection, would have had merit.  The drawing at issue herein was simply not "testimonial" as that term is understood for Confrontation Clause purposes.  In describing the class of "testimonial" statements implicating Sixth Amendment rights, the Court has noted that business records ordinarily fall outside this category because they are "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 2539-2540 (2009).

The drawing was prepared by a lab evidence technician who handled the intake and preliminary review of the evidence (in this case, the pants) received by the lab, but who did no analysis or scientific examination of the evidence (in this case, the pants).  Rather, the lab evidence technician in this case merely received the evidence (the pants) and cut some swatches from the evidence (the pants), while simultaneously noting the location of the swatch on a diagram, the purpose of which was to assist the analyst who performed the actual scientific examination of the evidence (the pants) and prepared a

report of the findings thereof. [*See* rec. pg. 136-138 and 102-104 , 110-111 (describing the standard procedure for handling incoming evidence by lab evidence technicians)].

Stated differently, the lab evidence technician merely received and prepared the evidence (the pants) for analysis by the forensic scientists (in this case Carolyn Booker, George Schiro and Dr. Nasir Butt, all of whom testified at petitioner's trial) who performed the tests and generated the reports implicating petitioner in the rape of J.S. Thus, the drawing at issue here was created for the "administration of [lab's] affairs," in the course of the lab's ordinary business and not created specifically to be used in a criminal trial and, as such, falls outside the scope of the Sixth Amendment's Confrontation Clause protection.

Moreover, the witnesses who provided "testimonial" evidence against petitioner, as that term is understood for Sixth Amendment Confrontation Clause purposes, were the three accusing forensic DNA  analysts, Carolyn Booker, George Schiro and Dr. Nasir Butt, each of whom testified at trial and were extensively cross-examination by the defense; the lab evidence technician who created the drawing at issue was merely an employee of the lab whose testimony would have been relevant only to establish the chain of custody of the pants, or the authenticity of the swatch obtained therefrom.[10]

---

[10]This is particularly the case herein given that the State did not elicit any substantive testimony regarding the drawing, nor use the exhibit to establish the truth of any fact at issue in the prosecution. Rather, it was defense counsel who utilized the exhibit substantively to establish that the swatch from which petitioner's semen was obtained come not from the crotch area of the pants, but rather from the left buttocks area. [rec. pg. 143-145, 147].

The Supreme Court did not intend such evidence to be the subject of a Confrontation Clause claim.  To the contrary, in *Melendez-Diaz v. Massachusetts*, the Court expressly excluded such evidence stating "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "[i]t is the obligation of the prosecution to establish the chain of custody," this does not mean that everyone who laid hands on the evidence must be called."  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 at fn. 1 (2009).

### III. Testimony of Sergeant Kenneth Edwards

Petitioner contends that he was prejudiced by the testimony of Sergeant Kenneth Edwards, a "compromised" police officer.  In support, petitioner provides a newspaper article purportedly reported in 2013 which announces that Sergeant Edwards had been arrested for doctor shopping and distributing drugs to inmates in the Opelousas City Jail on at least two occasions. [rec. pg. 447].  Petitioner alleges that this somehow affected the integrity of Sergeant Edwards' trial testimony as he claims that "his case was being investigated during the time frame of the allegations against Sgt. Kenneth Edwards."  He further suggests that the arrest of Sergeant Edwards' rendered his trial testimony perjurious.

The State Court summarily denied this claim as being "without merit." [rec. doc. 1-4, pg. 52].   Under the appropriate standard of review, this Court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of the State court record.

As correctly noted by the State, petitioner fails to demonstrate how the charges against Sergeant Edwards changed the outcome of his trial.  To the extent that petitioner's pleadings may be construed as asserting a Constitutional Due Process claim, in order to obtain federal *habeas corpus* relief on Due Process grounds, the petitioner must show more than prejudice to his substantial rights.  *Kirkpatrick v. Blackburn,* 777 F.2d 272, 279 (5th Cir. 1985).  The petitioner must establish that an error rendered his trial fundamentally unfair.  *Id. citing Lisenba v. California*, 314 U.S. 219, 236 (1941) ("In order to declare a denial of [due process guaranteed by the fourteenth amendment] we must find that the absence of [fundamental] fairness fatally infected the trial. . . .").  A trial is fundamentally unfair only when there is a reasonable probability that the verdict might have been different had the trial been properly conducted.  *Id.*  For the reasons which follow, in this case, petitioner has not established that the presentation of Sergeant Edwards' testimony made his trial fundamentally.

Contrary to petitioner's present allegations, Sergeant Edwards' testimony was not tainted by any alleged  wrongdoing which occurred during the time he investigated

petitioner's case.  To the contrary, the record reveals that Sergeant Edwards' trial testimony was based on his criminal investigation and report which was conducted and generated in 1994, sixteen year prior to petitioner's trial.  Furthermore, there is no evidence whatsoever that Sergeant Edwards' testimony was perjured.  To the contrary, the undersigned's review of the record demonstrates that his testimony was consistent with, and corroborated by, the testimony of the other witnesses who testified at trial, and in particular, the victim, J.S. and her brother, J.D.S.

Finally, given the relatively minor role of Sergeant Edwards' trial testimony in comparison with that of the other witnesses, and the overwhelming evidence of petitioner's guilt, including the testimony of J.S. and Dr. Parks regarding "penetration" and conclusive DNA evidence presented against petitioner, there is no reasonable probability that the outcome of petitioner's trial would have been different had Sergeant Edwards' testimony not been presented.  Accordingly, petitioner is not entitled to federal *habeas* relief on this claim.

## CONCLUSION

For the reasons set forth above;

**IT IS RECOMMENDED** that this petition for *habeas corpus* should be **DENIED AND DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A  party

may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, **79 F.3d 1415 (5th Cir.  1996).**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. §  2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

Signed at Lafayette, Louisiana this 30th day of June, 2015.

*C. Michael Hill*

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

45